IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **JENNIE L. SCOTT,**          ) | |
| ) | |
| ) | |
| **Plaintiff,**     ) | |
| ) | |
| v.                             ) | Case No.  04-CV-954-PJC |
| ) | |
| **JO ANNE B. BARNHART,**  ) | |
| **Commissioner of the Social**  ) | |
| **Security Administration,**    ) | |
| ) | |
| **Defendant.**    ) | |

**ORDER**

Claimant Jennie L. Scott ("Scott"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income and disability insurance benefits under the Social Security Act. In accordance with 28 U.S.C. § 636©)(1), ©)(3), the parties have consented to proceed before a United States Magistrate Judge and any appeal of this Order will be directly to the Tenth Circuit Court of Appeals. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, the Court REVERSES AND REMANDS the Commissioner's decision.

**Claimant's Background**

Scott was born on April 17, 1956, which made her forty-seven years old at the time of the hearing. (R. 33). She has a general equivalency diploma ("GED") and has formerly worked as a receptionist and day care worker. (R. 34, 107). According to her application, Scott alleges she became unable to work September 6, 2001 due to depression, stiffness in her joints,

fibromyalgia, back pain, neck problems, and arthritis. (R. 106). At the hearing, Scott testified that she also suffered from headaches, vision problems, breathing problems, arm fatigue and numbness, trembling hands, irritable bowel syndrome, incontinence, swelling of her legs, an irregular heartbeat, water retention, high blood pressure, and anxiety.[1] (R. 36, 38, 46, 57-58). She regularly takes a number of prescription drugs, *e.g.*, Lortab, Lasix, Albuterol, Flexeril, E-Mycin, Verapamil, Depakote, Xanax, Prevacid, Atenolol, and Neurontin, to name a few. (R. 38, 343).

Claimant was treated by Scott Sexter, M.D. at the Springer Clinic from November 6, 2000 until September 28, 2001 for allergies, hypertension, fibromyalgia, depression, obesity, onychogryposis, anxiety, lymphedema, and hyperlipidemia. (R. 148-80). On May 1, 2001, Scott complained of decreased vision in her left eye. (R. 161). MRIs were taken of Scott's brain and spine to determine the amount of vision loss in her left eye on May 20 and June 26, 2001. (R. 143-44, 147). The brain MRI showed no ophthalmic abnormality, though it showed sinusitis, empty sella and "a mild to moderate degree of cerebellar tonsillar ectopia, with tonsils extending 2 to 3 millimeters below the level of the foramen magnum." (R. 143-44). The MRI of Scott's spine showed "subtle degenerative changes on the left of C2-3 and centrally at the C6-7 level," though no significant central or neural foraminal stenosis or signal abnormality. (R. 147).

The bulk of Scott's medical records are from the Sapulpa Indian Health Center where she was treated by Phillip R. Berry, D.O., from September 2000 through August 2004. (R. 182-212, 260-65, 280-82, 285, 291-333, 365-402).[2]  Over that time period, Dr. Berry examined Scott

---

[1]   At the October 29, 2003 hearing, Scott testified that she was 5'6" and weighed 296 lbs. (R. 33).

[2]   Though records from June 11, 2003 through August 16, 2004 were not considered by the ALJ, they were considered by the Appeals Council and found to provide no basis for changing the ALJ's

many times, prescribed and authorized prescription refills, and ordered both medical and laboratory tests on multiple occasions. *Id.* Dr. Berry diagnosed Scott with severe depression, degenerative joint disease ("DJD"), obesity, reactive airway dysfunction syndrome ("RADS," commonly referred to as asthma), hypertension ("HTN"), fibromyalgia, cardiac arrhythmia, and chronic obstructive pulmonary disease ("COPD"). (R. 184, 191, 200, 291). A spirometry test on April 22, 2003 showed that Scott's lungs had moderate obstruction and low vital capacity. (R. 283-84).

In addition to medication for treatment of Scott's depression and anxiety, Dr. Berry referred Scott for counseling to Alice Coe M.S., L.P.C. (R. 267-79). Alice Coe counseled Scott on thirteen different occasions from September 13, 2001 to April 10, 2003. *Id.* On October 28, 2003 Dr. Berry completed a Mental Residual Functional Capacity Assessment of Scott, noting seven different areas where Scott had a moderate limitation, five areas where she had a marked limitation, and four areas where she had severe limitations due to recurrent, severe depression. (R. 346-47). Dr. Berry opined that Scott was severely limited in her ability to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (4) complete a normal work-day and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.*

Scott underwent a consultative medical examination by Moses A. Owoso, M.D., on April 30, 2002. (R. 213-16). Dr. Owoso noted Scott's complaint of neck and back pain and history of

---

decision. (R. 6-11, 365-402).

hypertension and depression. (R. 216). He found Scott's neurological examination to be normal, and her range of motion in her cervical and dorsolumbar spine, upper and lower extremities, and thumb and finger joints to be within functional limits. (R. 213-16). Dr. Owoso did not note any physical or neurological limitations. *Id.*

On May 13, 2002, Scott underwent a consultative psychological evaluation by Minor W. Gordon, Ph.D. (R. 221-22). Dr. Gordon concluded that Scott had a mild adjustment disorder with a depressed mood and opined that her mild depression should not preclude her from gainful employment. *Id.* He noted that Scott did not take Xanax on a consistent basis, and although she had been treated for a number of years on an outpatient basis for problems with depression, she had received no inpatient treatment. *Id.*

F. David Kondos, M.D., treated Scott in August 2002 and also in April through June 2003. (R. 286-90, 240-59, 334-45). Under Dr. Kondos' care, Scott had an echocardiogram on August 8, 2002 which showed a mildly dilated left ventricle, a 60-65% left ventricle ejection fraction, and diastolic parameters indicating diastolic dysfunction. (R. 287-88). On April 23, 2003, Scott was admitted to Saint Francis Hospital due to shortness of breath and tightness in her chest. (R. 255). Dr. Kondos again was Scott's attending physician. (R. 251). In his initial examination at that time, Dr. Kondos assessed Scott with the following: (1) sustained supraventricular tachycardia; (2) reactive airway disease with severe bronchospasms; (3) tobacco abuse seventy-plus pack year history; (4) depression, chronic; (5) anxiety, chronic and overwhelming; (6) morbid obesity; (7) a history of hypertension; (8) surgical menopause; (9) a history of gastroesophageal reflux disease; (10) fibromyalgia/chronic fatigue type syndrome; and (11) urinary incontinence. (R. 256). Dr. Kondos admitted Scott to the Coronary Care Unit for

monitoring and consultation. (R. 257). The cardiac consultant reported to Dr. Kondos that Scott's ventricular tachycardia was secondary to her "sympathomimetics and nicotine" and that she had asthma. (R. 241-42). The pulmonary consultant noted "expiratory wheezing in all lung fields" and recommended pulmonary function tests and a study for sleep apnea. (R. 246-47). A resulting lung scan showed no significant scintigraphic abnormality; however, a CT of Scott's chest showed "some cystic emphysematous areas in both lungs" and "some linear fibrotic stranding-scarring with pleural thickening in the lung bases." (R. 240, 245). A pulmonary function test indicated a "moderate diffusion defect in reduction and lung volumes suggest[ing] possible early parenchymal restrictive process." (R. 243).

After Scott was discharged, Dr. Kondos continued to treat her through June 20, 2003. (R. 334-45). Dr. Kondos either examined or approved prescription refills on ten different occasions. *Id.* During this time period, Dr. Kondos assessed Scott as suffering from asthma, COPD, anxiety and probable sleep apnea, noting that Scott's anxiety continued to be a major problem, particularly in her attempt to get off Xanax and nicotine. (R. 343-44). On May 9, 2003, Dr. Kondos indicated that Scott's psychiatric demeanor was anxious and she appeared to display psychomotor agitation. (R. 343). Again, on May 23, 2003, Dr. Kondos remarked that Scott's psychiatric demeanor was anxious and agitated. (R. 340).

On October 27, 2003, Dr. Kondos completed a physical RFC assessment, determining that Scott was limited to ten minutes of continuous and one hour total of sitting, standing, or walking in an eight-hour day; she could lift or carry up to ten pounds occasionally; she could not bend, squat, crawl, or climb; her use of leg controls was limited; her use of hands for repetitive movement was limited permitting her to reach, handle and finger only occasionally; she was

totally restricted from activities involving unprotected heights, being around moving machinery, and vibrations, though moderately restricted in driving and to changes in temperatures and exposure to dust, fumes, and gas. (R. 350-52). Dr. Kondos based his assessment upon Scott's severe asthma and COPD, hypertension, fibromyalgia, morbid obesity, severe anxiety, and chronic right shoulder pain. (R. 351). He opined that Scott was unable to work as she required frequent changes in positions, suffered from chronic pain and fatigue, and had a high incidence of absenteeism from work. (R. 352).

On June 3, 2002, DDS psychologist C.M. Kampschaefer, Psy.D., completed a psychiatric review technique ("PRT") form finding that Scott suffered from depressive syndrome as evidenced by appetite disturbance with changes in weight, sleep disturbances, decreased energy, and thoughts of suicide, as well as generalized anxiety. (R. 232-34). Dr. Kampschaefer determined that Scott's activities of daily living and social functioning were moderately limited; she had mild difficulties in maintaining concentration, persistence or pace, and had one or two episodes of decompensation of extended duration. (R. 235).

Dr. Kampschaefer also completed a Mental Residual Functional Capacity Assessment finding there was no significant limitation in Scott's understanding; she possessed sustained concentration and persistence; and she was only moderately limited in her social interaction and adaptation and in her ability to carry out detailed instructions and to interact appropriately with the general public. (R. 237-38). He concluded that although Scott had difficulty relating to the general public and was somewhat limited in carrying out detailed instructions, she could relate to supervisors and coworkers "in an incidental fashion," adapt to work changes, and could mentally complete a normal workday and workweek. (R. 239)

Finally, a DDS physician performed a Physical Residual Functional Capacity Assessment and limited Scott to lifting twenty pounds occasionally, ten pounds frequently, standing and/or walking and sitting about 6 hours in an 8-hour day. *Id*. The assessment states Scott had no limitations in pushing and pulling and no postural, manipulative, visual, communicative, or environmental limitations. (R. 224-25). Importantly, the RFC notes no treating or examining source statements regarding Scott's physical capacities. (R. 230).

## Procedural History

On February 6, 2002, Scott applied for Disability Insurance Benefits under Title II, 42 U.S.C. § 401 *et seq*., and for Supplemental Security Income Benefits under Title XVI, 42 U.S.C. § 1381 *et seq*. (R. 92-94, 354-57). Scott's applications were denied in their entirety both initially and on reconsideration. (R. 74-80, 359-364). A hearing before ALJ Denzel R. Busick was held on October 29, 2003. (R. 29-71). By decision dated December 15, 2003, the ALJ found that claimant was not disabled at any time through the date of the decision. (R. 21-28). On November 16, 2004, the Appeals Council denied review of the ALJ's findings. (R. 6-8). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and the Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education,

and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920.[3] Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991).

Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2002) (citation omitted). In reviewing the decision of the Commissioner, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Id.* (citation omitted). Nevertheless, the court examines "the record as a whole, including whatever in the record fairly detracts from the weight of the Secretary's decision and, on that basis, determines if the substantiality of the evidence test

---

[3] Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.972. Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is engaged in substantial gainful activity, Step One, or if the claimant's impairment is not medically severe, Step Two, disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity to perform her past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. §§ 404.1520, 416.920.

has been met." *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800-01 (10th Cir. 1991).

## The Decision of the Administrative Law Judge

The ALJ found that Scott's fibromyalgia, degenerative changes at C2-3 and C6-7, reactive airway disease, and depression were severe impairments. (R. 23). He discussed Listings 1.04, 3.02, and 12.04; however he concluded that Scott's impairments either individually or in combination did not meet or medically equal any listing. (R. 23). The ALJ found that Scott had the RFC to perform the exertional and nonexertional requirements of work except for lifting over ten pounds frequently and twenty pounds occasionally and no exposure to concentrated dust, fumes, odors, gases, poor ventilation, high temperatures, high humidity, or extreme cold. He also found that she could not perform work which required good vision in her left eye and she required the ability to use the restroom when needed. (R. 25). Based upon the RFC, the ALJ concluded that Scott could still perform her past relevant work as a receptionist. Alternatively, the ALJ found that there were a significant number of jobs in the regional and national economies which Scott could perform despite her impairments; *i.e.*, mail clerk, office helper, sorter, miscellaneous laborer, assembler, and newspaper cutting and pasting. (R. 26). Thus, the ALJ concluded that Scott was not disabled under the Social Security Act at any time through the date of the decision.

**Review**

Scott contends that the ALJ erred in failing to perform a proper analysis of her treating physicians' opinions, a proper evaluation at Steps 2 through 5 of the sequential evaluative process, and a proper credibility determination. As the Court finds that the ALJ failed to properly weigh the opinions of Scott's treating physicians, Drs. Kondos and Berry, the Court does not reach the other claimed bases of error.

A treating physician may offer an opinion that reflects a judgment about the nature and severity of the claimant's impairments, including the claimant's symptoms, diagnosis and prognosis, what the claimant can do despite his or her impairment, and any physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it. *Goatcher v. U.S. Dept. of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995). The Commissioner will give controlling weight to such an opinion if it is well-supported by clinical and laboratory diagnostic techniques and if it is consistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Reyes v. Brown*, 845 F.2d 242, 245 (10th Cir. 1988). Reports of physicians who have treated a patient over a period of time are given greater weight than reports of physicians employed or paid by the government for the purpose of defending against a disability claim. *Frey v. Brown*, 816 F.2d 508, 513 (10th Cir. 1987); *Broadbent v. Harris*, 698 F.2d 407, 412 (10th Cir. 1983). A treating physician may specifically opine as to whether the claimant is disabled or unable to work, as to whether the

claimant's impairments meet a listing, as to the claimant's RFC, or as to the application of vocational factors. Such an opinion is not dispositive, however, because ultimate responsibility for determining the ultimate issue of disability is reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e).

If the ALJ decides not to give the treating physician's opinion controlling weight, he must consider the following factors in order to determine how much weight to give the opinion:

(1) the length of the treatment relationship and the frequency of examination;

(2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;

(3) the degree to which the physician's opinion is supported by relevant evidence;

(4) the degree of consistency between the opinion and the record as a whole;

(5) whether or not the physician is a specialist in the area upon which the opinion is rendered;

(6) other facts brought to the ALJ's attention which tend to support or contradict the opinion.

20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6); *Goatcher*, 52 F.3d at 290.

The ALJ acknowledged that Dr. Kondos completed a physical RFC assessment indicating that Scott could not even perform sedentary work and Dr. Berry completed a mental RFC assessment indicating that Scott had "marked to severe limitations in most areas of mental functioning." (R. 25). The ALJ stated that although he carefully considered the opinions of these treating physicians, he did not give them controlling weight "because they are inconsistent with their own treatment records and with the other substantial evidence." *Id*. He, however, did not state what weight he accorded these opinions.

The ALJ did not adequately address Dr. Kondos' RFC assessment of Scott.[4]   The ALJ found that Dr. Kondos' RFC assessment was not entitled to controlling weight based on the following:

> Based on the evidence, Dr. Kondos first saw the claimant when she was hospitalized on April 29, 2003 (Exhibit 10F).  He then saw the claimant on three occasions after she was discharged mainly for medication issues (Exhibit 20F). Thus, his treatment records do not substantiate that the claimant could not perform even sedentary work.  Also, as noted above, on April 29, 2003, the claimant stated that she had a multitude of medical problems and Dr. Kondos commented that she had "made no effort to correct them" (Exhibit 10F, page 17).

The Court first notes that the ALJ is incorrect in stating that Dr. Kondos first saw Scott on April 29, 2003.  The records show that Dr. Kondos was Scott's attending physician when she had an echocardiogram on August 8, 2002.  (R. 287-88).  Further, the ALJ did not explain how Dr. Kondos' treatment records do not substantiate his RFC assessment.  In assessing Scott's RFC, Dr. Kondos specifically stated that he based his assessment on Scott's severe asthma, COPD, hypertension, fibromyalgia, morbid obesity, severe anxiety and chronic right shoulder pain.  And these conditions were noted throughout Dr. Kondos' treatment records.  Yet, the ALJ did not make any reference to Dr. Kondos' office or hospital records to show that Dr. Kondos had no foundation for his RFC assessment or to discuss the evidence that did not support Dr. Kondos' assessment.

---

[4]   Dr. Kondos' RFC assessment limited Scott to sitting, standing, and/or walking for only ten minutes at a time; sitting, standing, and/or walking for only one hour within an eight-hour day; and lifting and carrying of 10 lbs. occasionally.  (R. 351).  Additionally, Scott's use of leg controls was limited; she was not to bend, squat, crawl, or climb; and her use of hands for repetitive movement was limited, permitting her to reach, handle and finger only occasionally.  (R. 351).  Dr. Kondos completely restricted Scott from performing any activity which involves unprotected heights, being around moving machinery, or vibrations; marked changes in temperatures and humidity; exposure to dust, fumes, and gases; and moderately restricted her driving activity.  *Id.*

Similarly, the ALJ failed to adequately weigh the opinion of Scott's treating physician, Dr. Berry. The ALJ determined that Dr. Berry's mental RFC assessment was not entitled to controlling weight based on the following:

> It must be pointed out that Dr. Berry is not a mental health professional. The claimant has rarely sought treatment from a mental health professional and there is only one reference to this in the record. On August 22, 2000, the claimant said she had been seen by a psychiatrist at Laureate on one occasion (Exhibit 3F, page 33). No treatment records were submitted and there is no evidence that she was seen more than once. The claimant has received the majority of her treatment for depression at Creek Nation Clinic and these records indicate she received occasional counseling and medication refills (Exhibits 4F, 14F, and 19F). When the claimant was evaluated by a mental health professional on May 6, 2002, it was noted she had mild depression that would not preclude her from gainful employment (Exhibit 6F, page 2).

In essence, the ALJ rejected Dr. Berry's opinion because he was not a mental health professional. However, he offers no evidence to support his conclusion. In any case, even if Dr. Berry is not a "mental health professional," the record shows that he is a licensed osteopathic doctor who has treated Scott for a considerable period of time, from September 2000 through August 16, 2004, for depression and anxiety, among other conditions, and has on various occasions prescribed her Depakote, Xanax, Clonidine, Effexor, and Celexa. (182, 184, 186, 187, 189, 191, 193, 195, 197, 200, 202, 291, 302, 308, 311, 319, 232, 330, 331). The records also reflect that Dr. Berry recommended and oversaw the outpatient counseling by Alice Coe from September 13, 2001 to April 10, 2003, which the ALJ noted was the "majority of her treatment for depression." (R. 267-79). Thus, Dr. Berry was able to provide "a detailed, longitudinal picture" of Scott's mental functional capacity. 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2) (treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from . . . reports of individual examination, such as consultative examination."). To the

13

extent the ALJ discredited Dr. Barry's opinion because Scott only saw a psychiatrist once, the Court notes that there is no requirement that a claimant receive treatment from a psychiatrist in order to establish mental disability.

Assuming *arguendo* that Dr. Berry's medical opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. §§ 404.1527(d) and 416.927(d).  Yet, the only factor mentioned by the ALJ was Dr. Berry's alleged lack of specialization as a "mental health professional."  There is no discussion of the consistency between Dr. Berry's opinion and the rest of the record; the Court notes that Dr. Berry's medical conclusions are consistent with Dr. Kondos,' another of Scott's treating physicians.  In addition, it appears from the ALJ's discussion of Dr. Gordon's opinion that he examined Dr. Berry's mental RFC assessment to see if it outweighed Dr. Gordon's consultative examination, when *Goatcher* clearly dictates that the analysis must proceed in the opposite manner.  *Goatcher*, 52 F.3d at 290  ( It is the job of the ALJ "to examine the other physician's reports to see if they outweigh the treating physician's report, not the other way around.").

For the reasons stated, the Court finds the case should be REVERSED because the ALJ did not apply the correct legal standards and the decision is not supported by substantial evidence.  On remand, in addition to a proper analysis of the opinions of Scott's treating physicians, Drs. Kondos and Berry, the ALJ should also consider whether Scott's obesity and anxiety are severe impairments at Step Two of the sequential process.  20 C.F.R. §§ 404.1520, 416.920.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner be

**REVERSED AND REMANDED** for further proceedings consistent with this opinion.

DATED this 30th day of March, 2006.

_____
Paul J. Cleary
United States Magistrate Judge